MEYER'S ESTATE et al. v. COMMISSIONER OF INTERNAL REVENUE.
(three cases).

No. 13957.

United States Court of Appeals
Fifth Circuit.

Dec. 17, 1952.

Forney Johnston and Paul Johnston, Birmingham, Ala., for petitioner.

Robert N. Willan, Attorney, Tax Div., Dept. of Justice, Washington, D. C., Ellis N. Slack, Acting Asst. Atty. Gen., Maryhelen Wigle, Sp. Asst. to Atty. Gen., Mason B. Leming, Acting Chief Counsel, Bur. Int. Rev., and Charles E. Lowery, Sp. Atty., Washington, D. C., for respondent.

200 F.2d—38

Before BORAH, STRUM and RIVES, Circuit Judges.

RIVES, Circuit Judge.

These consolidated petitions for review involve income taxes for the year 1944, and the controversy arises out of the liquidation in 1944 of Meyer Hotel Interests, Inc. (sometimes referred to as Meyer, Inc.), the surviving corporation in the merger in 1941 of a corporation of the same name with Commonwealth Hotel Finance Corporation (sometimes referred to as Commonwealth).

On and for sometime prior to July 1, 1929, Robert R. Meyer was the dominant stockholder in eight hotel owning, leasing or operating companies. The shares of stock not owned by him were held by persons closely associated with him, as relatives, employees or longtime associates. The minutes of the operating companies, wholly owned by Meyer and his associates, show the holding of directors' meetings on July 1, 1929, authorizing the payment of dividends to stockholders of record as of July 2, 1929, in the aggregate amount of $815,049.75, representing the entire amounts of the earned surplus of those companies.

The minutes of the first directors' meeting of Meyer, Inc., bearing date of July 2, 1929, recite and accept the offer of Robert R. Meyer and his associates to transfer the stock of the hotel operating companies in full payment for a specified number of shares of common and preferred stock of Meyer, Inc.

The minutes of the first meeting of the stockholders of Meyer, Inc., bearing date of July 2, 1929, recite that a statement was presented showing the amount of dividends received on the stocks owned by the new corporation. The amount shown as received was $815,049.75 and consisted of the dividends declared by the operating companies above referred to. The minutes further recited that property of a specified value be transferred to Commonwealth in exchange for a certain number of shares of Commonwealth's preferred and common stock, to be issued directly to the stockholders of Meyer, Inc. according to their interests.

Meyer, Inc. was a personal holding company and its principal function was to hold the stock of the hotel operating companies. The above stated amount of $815,049.75 represented by the dividend assets received was credited to the surplus account on the books of Meyer, Inc., and that account was charged with the sum of $1,041,898.57, which latter amount represented the value of the property transferred to Commonwealth in consideration of the issuance of that company's stock direct to the stockholders of Meyer, Inc.

The stockholders of the operating companies did not report in their tax returns for 1929 the $815,049.75 earned surplus of the companies and Meyer, Inc. did report $825,649.75 [1] dividends received, though it paid no taxes on these dividends as it offset them on its corporate schedule against the value of the various properties transferred to Commonwealth, or $1,041,898.57.

On December 30, 1941, Commonwealth was merged into Meyer, Inc. The capital and surplus accounts on the books of Meyer, Inc., then showed an earned surplus of $79,676.03, and failed to reflect the $815,049.75 increase in surplus resulting from the transfer of the original untaxed dividends back to Meyer, Inc. in the merger.

On November 1, 1944, a plan of liquidation of Meyer, Inc. was agreed upon and adopted. At that time the earned surplus figure outstanding on the books of Meyer, Inc. was $79,728.86. Instead of returning their gain on the liquidation as a capital gain under the usual procedure of Section 115(c) of the Internal Revenue Code, 26 U.S.C.A. § 115(c), the owners of more than 80% of the corporation's voting stock (in fact, all of the stockholders) filed with the Commissioner elections to have their gain

on liquidation taxed in the alternative manner provided in Section 112(b)(7) of the Code, 26 U.S.C.A. § 112(b)(7).[2] The beneficial application for tax purposes of Section 112(b)(7) was limited mainly to those corporations or personal holding companies which had a relatively small accumulation of earnings and profits (i. e., earned surplus) at the time of liquidation, while the ordinary provisions of Section 115(c) were definitely more advantageous taxwise for those companies having a large earned surplus upon liquidation.

The above election of the stockholders was made in reliance on the earned surplus of Meyer, Inc. in the amount of $79,728.86, as that figure appeared on the corporate books on November 1, 1944. The stockholders included in their 1944 tax returns their respective pro rata shares of this earned surplus figure as ordinary income, as required under Section 112(b)(7). However, upon audit of the returns after the death of the individual taxpayers, the Commissioner determined that the true earned surplus of Meyer, Inc. as a result of the 1929 reorganization and the 1941 merger properly aggregated the sum of $1,027,078.87, and that the estates of the deceased taxpayers were taxable on their pro rata portion of that amount, rather than on the basis of the $79,728.86 earned surplus figure as shown on the corporate books. Deficiencies were assessed accordingly.

When it became evident as a result of the Commissioner's large upward adjustment in earned surplus that the stockholders' election to be taxed under Section 112(b)(7) rather than Section 115(c) would entail a large deficiency assessment and disproportionately high tax they attempted conditionally to withdraw and rescind their elec-

---

1. This figure is apparently an error for $815,049.75.

2. Insofar as here applicable Section 112 (b)(7) provided for the current taxation of gain on a corporate liquidation as ordinary income to the extent of each stockholder's pro rata share of the accumulated earnings and profits (i. e. earned surplus) of the corporation at the time of liquidation, and permitted the postponement of tax upon any gain resulting from the liquidation to the extent of the corporate assets received by the stockholders which were not represented by accumulated earnings and profits (including any part of the gain referable to appreciation in value of the corporate assets distributed) until the distributed property should be subsequently disposed of by the stockholders.

tion [3] on the ground that it was based upon a material mistake of fact, i. e. reliance on the wrong earned surplus figure. In support of their contention of reliance in good faith on the $79,728.86 earned surplus figure as motivating their election, petitioners here rely upon certain testimony, documentary exhibits and memoranda, admissions by the Tax Court and concessions by the Commissioner, but principally they rely upon paragraph 28 of the stipulation of facts entered into with respondent's counsel before the Tax Court, which reads as follows:

"28. In considering the advisability of liquidating Meyer, Inc. and in electing to have any gain thereon taxed under the provisions of IRC Sec. 112 (b) (7) the decedent, Robert R. Meyer, and the other stockholders of Meyer, Inc. relied upon the earned surplus account in the amount of $79,728.86 as shown by the corportion's books and by the audit reports of Ernst & Ernst, Certified Public Accountants. The said Meyer and his staff of office advisers were furnished with and likewise relied upon the memoranda, letters, and financial statements hereinafter identified as Exhibits 81 to 90, inclusive, said exhibits comprising all of the documentary data furnished to and relied upon by the decedent, Robert R. Meyer, and the other stockholders of

Meyer, Inc. in proceeding with the liquidation of said corporation and in electing to have any gain thereon taxed to them under the provisions of Sec. 112(b)(7)."

The Commissioner here insists, as he did before the Tax Court, that (1) mistake or no mistake, valid regulations issued pursuant to Section 112(b)(7) of the statute [4] do not permit withdrawal of the elections, and that, (2) in any event, equitable considerations sufficient to relieve petitioners from the burdensome tax consequences of their election are not present here because taxpayers either knew, or were charged with knowledge of the existence of the large 1929 surplus and its significance for tax purposes upon liquidation.

The Tax Court in its opinion held that the regulations prohibiting withdrawal of the elections were valid and the elections therefore could not be revoked "as a matter of right". However, it recognized the principle that " * * * there is, under settled law, no election without full knowledge of the facts". In construing the effect of the stipulation the Court conceded that taxpayers "obviously * * * did so rely" on the earned surplus figure of $79,-728.86 in making their election, but concluded that this "does not eliminate, nor prove lack of, knowledge in them, of the previous corporate record, or reorganization, non-taxable, in 1929." [5] The Commis-

---

3. The amendment attempting to withdraw the election filed by each of the three deceased taxpayers recites:

"Taxpayer conditionally withdraws and rescinds said election to the extent that, if after definitive determination of the status of the earned surplus (accumulated earnings and profits) account of Meyer Hotel Interests, Inc., taxpayer's income tax liability computed on the basis of an election under the provisions of IRC Section 112(b) (7) is greater than such liability computed under the provisions of IRC Section 115(c), such withdrawal and rescission shall be final and, in such event, taxpayer elects to have the gain on the liquidation of Meyer Hotel Interests, Inc., in 1944 recognized and taxed under the provisions of said Section 115(c). * * *"

4. Treasury Regulations 111, Section 29.112 (b) (7)-2, promulgated by the Commis-

sioner pursuant to the statute provides:
"Any shareholder * * * is a qualified electing shareholder if—

"(1) His written election * * * which can not be withdrawn or revoked, has been made and filed as prescribed in section 29.112(b) (7)-3; * * * *".

5. In its interpretation of the disputed section of the stipulation the Tax Court further stated:

"The petitioners heatedly argue, in substance, that the respondent's representatives by such stipulation agreed that the stockholders had no knowledge of the complete facts such as to cause binding election, and are improperly contending otherwise; but we think petitioners construe the stipulation too broadly. * * * we can not believe that the respondent's representatives intended to or did stipulate so .broadly as contended. If they had done so they

sioner's deficiency assessment on the basis of the 1929 earned surplus was accordingly sustained.

■ The Tax Court correctly held that the regulation prohibiting revocation of the elections is valid and that petitioners could not revoke valid elections as a matter of right. The regulation is compatible with the terms of the statute and appears reasonably designed to effectuate the policy of furthering orderly administration of the tax laws and prompt collection of the Federal revenues. Thus construed, it has the force and effect of law. See Helvering v. Wilshire Oil Co., 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101; Maryland Casualty Co. v. United States, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297; Pictorial Review Co. v. Helvering, 63 App.D.C. 21, 68 F.2d 766.

■ The Tax Court erred, however, in failing to give effect to the plain meaning and import of the stipulation between the parties. The sense of Section 28 of the stipulation is that the deceased taxpayers relied on and accepted the earned surplus of $79,728.86 as shown on the corporate books in the belief that it was the correct earned surplus for tax purposes upon liquidation. The phrase "relied upon", as here used, necessarily implies reliance in good faith. See 36 Words & Phrases, Reliable, page 780; 10 C.J.S. p. 238; Menke v. Rovin, 352 Mo. 826, 180 S.W.2d 24, 27.[6] In

this connection, it should be noted that no fraud or bad faith on the part of the deceased taxpayers in making their election is here alleged or proved, as both the Tax Court and the Commissioner concede.

■ The mere existence of the corporate reorganization records of 1929 without any showing that their accounting effect on the earned surplus and significance for tax purposes was realized some fifteen years later upon liquidation would not, absent any showing of fraud or bad faith, conclusively negative a *bona fide* mistake of fact. It is unreasonable to assume that taxpayers "relied upon" the existence of the small earned surplus and yet at the same time had knowledge or independent recollection of the true large surplus sufficient to render their purported reliance fictitious. The ordinary common sense interpretation of the word presupposes that "reliance" is either *bona fide* and genuine or that it does not in fact exist. The Tax Court's conclusion to the contrary is inconsistent and clearly erroneous for it has the effect of "forcing from plain words unusual and unnatural meanings"[7] and its interpretation "would manifestly conflict with and torture the plain language and meaning of the stipulation".[8]

Section 112(b)(7) requires that the filing of an election "must be within thirty days after the adoption of the plan of liquida-

would in effect have confessed the case on this crucial issue—for there is, under settled law, no election without full knowledge of the facts. We do not, in the language used, find intent to stipulate what the complete knowledge of three deceased participants' facts was. We ascribe no such knowledge to Meyer and the other stockholders; but we do note that the petitioners have not by any means shown that the stockholders did not remember and have knowledge of their own proceedings in 1929. Though Meyer and Taylor were dead and Kavanaugh apparently in no condition to testify, that fact can not be here considered of weight, for it may be that if alive and able to testify examination would have developed knowledge of the 1929 reorganization. * * * In this position, petitioners' basis of ignorance to destroy election, is found lacking."

Although the disputed section of the

stipulation here involved does not include after "relied upon" the phrase "in good faith", the affidavit attached to the election form signed by the principal taxpayer, decedent Robert R. Meyer, does include the following language:

"I/We swear or affirm that this election is made of my/our own free will and accord * * * and that the statements made herein * * * are * * * made *in good faith* pursuant to the requirements of section 112(b)(7) of the Internal Revenue Code and the regulations issued thereunder." (Italics supplied.)

7. Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492, 52 S.Ct. 230, 231, 76 L.Ed. 416.

8. Cf. McDaniel v. California-Western States Life Ins. Co., 181 F.2d 606, 609, 17 A.L.R.2d 1036; see also 50 Am.Jur., Stipulations, Sec. 8, p. 609.

tion". Petitioners do not here seek to set aside or extend that statutory period in order to invoke an affirmative election thereunder, and could not do so because their statutory option would have lapsed through its non-exercise within the time allowed. What petitioners do seek is their right, timely asserted, to *abandon* an otherwise valid and already subsisting election on the ground of a material mistake of fact.

 The authorities relied upon by the Tax Court and the Commissioner as prohibiting petitioners from revoking their election are not controlling here. Cf. Pacific National Co. v. Welch, 304 U.S. 191, 58 S.Ct. 857, 82 L.Ed. 1282; Helvering v. Wilshire Oil Co., 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101; U. S. v. Pettigrew, 9 Cir., 81 F.2d 666; Moran v. Commissioner, 1 Cir., 67 F.2d 601; Rose v. Grant, 5 Cir., 39 F.2d 340. Generally these cases may be distinguished either on the ground that they did not involve a stipulation as to a mistake of fact motivating the election or arose under divergent tax statutes providing for optional methods of reporting income where it was held that to permit withdrawal of the election would impose burdensome uncertainties upon the administration of the revenue laws. Considerations of administrative necessity requiring the usual taxpayer to stand by his election once made are not so compelling as to require a like result here.[9] See Lucas v. Sterling Oil & Gas Co., 6 Cir., 62 F.2d 951; Patent Royalties Corp. v. Commissioner, 2 Cir., 65 F.2d 580; Morrow, Becker & Ewing, Inc. v. Commissioner, 5 Cir., 57 F.2d 1; Momsen-Dunnegan-Ryan Co. v. Helvering, 63 App.D.C. 9, 68 F.2d 754. This is particularly true because Section 112(b)(7), being remedial in nature, should be liberally construed in favor of taxpayers and its legislative purpose to encourage the liquidation of personal holding companies should not be thwarted by narrow interpretation or administration. See 50 Am.Jur., Statutes, Sec. 386, p. 400.

To hold petitioners to the elections under Section 112(b)(7) where Section 115(c) would have been clearly indicated but for the stipulated mistake of fact as to the large earned surplus figure would in effect convert a remedial statute enacted to aid taxpayers into a punitive statute inflicting a disproportionately harsh tax liability upon them. No such inequitable result is here warranted.

It follows that the amendments filed were effective to render Section 112(b)(7) inapplicable to the 1944 liquidation of Meyer, Inc., and that the gain on liquidation is to be taxed as a capital gain under Section 115(c) of the Internal Revenue Code.

The judgment of the Tax Court is reversed.

9. In this connection, it should be noted that petitioners filed amendments to the elections prior to expiration of the period during which the Commissioner was precluded from making the assessments final. See 26 U.S.C.A. § 272. While the audit remained open the amendments would appear timely filed and it does not appear that any substantial prejudice to administration of the revenue laws could result by their allowance.